# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

JAMES A. WILBUR,                    §
                                    §
            *Plaintiff*,            §
                                    §
*versus*                            §    CIVIL ACTION NO. 5:13-110
                                    §
CAROLYN W. COLVIN,                  §
Acting Commissioner of             §
Social Security,                    §
                                    §
            *Defendant*.            §

## <u>MEMORANDUM OPINION</u>

James A. Wilbur ("Wilbur") seeks review of a partially adverse-decision on his application for disability-based benefits under the Social Security Act.[1]

## I.  Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence.  *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). When reviewing acts of administrative agencies, courts also must take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706; *see also* 28 U.S.C. § 2111 (directing that judgments given upon examination of records be "without

---

[1]      Wilbur applied for disability insurance benefits available under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. Disability Insurance benefits provide income to insured individuals forced into involuntary, premature retirement by reason of disability.  *See* 42 U.S.C. § 423(d).

regard to errors or defects which do not affect the substantial rights of the parties"); *see also* FED. R. CIV. P. 61 (stating that "the court must disregard all errors and defects that do not affect any party's substantial rights").

# I. Background

Wilbur alleged disability commencing September 6, 2005, due to lower back pain and nerve damage. (T. 194, 223). After lengthy administrative proceedings,[2] an administrative law judge, John P. Ramos (ALJ Ramos) *granted* Wilbur's application and *awarded benefits* based on disability commencing on November 16, 2010. (T. 22-34). Wilbur requested Appeals Council review of that portion of ALJ Ramos's decision holding Wilbur not disabled prior to November 16, 2010 — *i.e.*, the period between September 6, 2005, and November 16, 2010. (T. 1-8). The Appeals Council denied that request, and Wilbur instituted this proceeding.

---

[2] Wilbur's claim was denied initially. (T. 114). After requesting an evidentiary hearing, the matter was assigned to administrative law judge, Thomas P. Tielens ("ALJ Tielens"), who conducted a hearing, and, thereafter, denied the application. (T. 58-74, 94-101). The Appeals Council vacated ALJ Tielens's decision and remanded the matter for a new hearing. (T. 110-13). In its remand order, the Appeals Council directed the administrative law judge to: (1) consider the evidence submitted with the request for review in assessing the severity of the claimant's impairments; and (2) give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations. (T. 112).

While Wilbur's appeal of ALJ Tielens's decision was pending before the Appeals Council, Wilbur filed a subsequent application for disability insurance benefits. (T. 113). The Appeals Council ruled that its action regarding Wilbur's first application rendered Wilbur's second application duplicative. (*Id.*). The Appeals Council directed the administrative law judge on remand to "associate" Wilbur's two applications, and render a new decision on the associated claims. (*Id.*).

On remand, the matter was assigned to ALJ John P. Ramos, who conducted an evidentiary hearing at which Wilbur appeared and testified. (T. 75-89). ALJ Ramos determined that Wilbur should undergo an updated consultative orthopedic examination, with a residual functional capacity evaluation. (T. 1011-1021). Thereafter, ALJ Ramos received additional evidence from Dr. Joseph Prezio, M.D. which was entered into the record without objection. (T. 23, 345-47, 348-49).

## II. Commissioner's Decision[3]

With respect to the period of alleged disability *before* November 16, 2010, ALJ Ramos found that Wilbur never engaged in substantial gainful activity, and met insurance requirements of the Act. (T. 25). He found that Wilbur had a severe impairment consisting of degenerative disc disease of the lumbar spine status-post surgery. (*Id.*). This impairment reduced his residual functional capacity such that he could perform only a full range of sedentary work.[4] (*Id.*).

Due to reduced residual functional capacity, ALJ Ramos found that Wilbur lacked physical ability to perform past relevant work as a steel mill worker. (T. 31) He further found, however, that Wilbur could perform alternative, available work. In this respect, ALJ Ramos applied Medical–Vocational Guidelines commonly referred to as "the grids" (T. 32), and concluded that a finding of "not disabled" was directed by Rule 201.21. (*Id.*).

---

[3]     ALJ Ramos utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act. The procedure is "sequential" in the sense that when a decision can be reached at an early step, remaining steps are not considered. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

[4]     ALJ Ramos's residual functional capacity finding was as follows:

After careful consideration of the entire record, the undersigned finds that, prior to November 16, 2010, the date the claimant became disabled, the claimant had the residual functional capacity to sit for six hours in an eight-hour workday, stand and/or walk for a total of two hours in an eight-hour workday, and could occasionally lift and/or carry no more than 10 pounds.

(T. 26).

### III. Points of Alleged Error

Wilbur's brief articulates three points of alleged error:

1. The ALJ erred by failing to recontact Plaintiff's treating physician, Dr. Silverstein, for clarification of his opinion;

2. The ALJ's credibility findings that are unsupported by substantial evidence because the ALJ erred in considering the required factors when assessing Plaintiff's credibility; and

3. The ALJ's Step 5 determination is unsupported by substantial evidence because the ALJ failed to obtain testimony of a vocational expert despite the presence of significant nonexertional impairments.

(Dkt. No. 12).

### IV. Residual Functional Capacity

Wilbur's first two points ultimately relate to ALJ Ramos's determination of Wilbur's "residual functional capacity" during the contested 2005 - 2010 period. This term refers to what persons can still do in work settings despite physical and/or mental limitations caused by their impairments and related symptoms, such as pain. *See* 20 C.F.R. § 404.1545(a)(1); *see also* SSR 96–8p, TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, at *2 (SSA July 2, 1996). When arriving at such determinations, administrative law judges consider and assess credibility of all relevant evidence, including forensic medical opinions and subjective lay testimony.

Wilbur's first point argues that ALJ Ramos erred in assessing credibility of a treating physician's medical opinion. Wilbur's second point argues that ALJ Ramos erred when evaluating credibility of Wilbur's subjective testimony.

A.    *Medical Opinion of Dr. Silverstein*

Dr. Bruce N. Silverstein, M.D.,  treated Wilbur on a monthly basis from the alleged date of onset (September 2005) through and beyond the established onset date (November 16, 2010).    In connection  with  separate  worker compensation proceedings, Dr. Silverstein repeatedly opined that Wilbur was totally disabled, and unable to return to work.  (T. 634-59, 674, 725, 727, 733, 882, 888, 900, 932, 997-98).

ALJ Ramos's decision does not mention Dr. Silverstein by name, but it references (by exhibit numbers) testimony given by Dr. Silverstein (and other treating sources) "during several depositions that took place prior to November 16, 2010 in connection with the claimant's Workers' Compensation claim."[5] ALJ Ramos stated that he considered these treating provider reports only for their reported clinical and diagnostic findings and functional limitations, because "conclusory statements  assessing  disability  under  Workers'  Compensation guidelines or rules . . .  are . . . not binding . . . and represent an opinion on an issue reserved to the Commissioner." (T. 30).  ALJ Ramos stated, nonetheless, that he afforded *some* weight to testimony given by Wilbur's treating sources, noting that "[m]ost of the claimant's treating sources indicated that the claimant could go back to sedentary/light work and/or could undergo job retraining." (T. 30).

---

[5]    ALJ Ramos referenced exhibits "51F, 52F, 53F, 54F, and 55F" that, respectively, were deposition testimony of Dr. Silverstein, Elaina A. Piroo-Lombardi, M.D., and Gerard Rodziewicz, M.D.  (T. 30, 925-41, 942-65, 966-73, 974-992, 993-1009).

1.    <u>Wilbur's Challenge</u>

Wilbur argues that ALJ Ramos erred by failing to recontact Dr. Silverstein, for "clarification" of his opinions.  Wilbur first takes issue with ALJ Ramos's decision to disregard Dr. Silverstein's opinions of total disability simply because they were expressed in a worker compensation proceeding.  Further, Wilbur argues that subsumed into ALJ Ramos's duty to develop the record was a requirement to seek clarification of Dr. Silverstein's ultimate-issue opinion that Wilbur was unable to work.  (Dkt. No. 12, pp. 19-20).

2.    <u>Governing Legal Principles</u>

a.    *Duty to Develop Record*

When evidence in hand is inadequate to determine whether a claimant is disabled, an administrative law judge should re-contact a treating physician or other medical sources and request additional information. 20 C.F.R. §§ 404.1512(e), 404.1520(c); *see also Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir.1999) ("[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel . . . .' "; an administrative law judge may not rely on sparse notes nor conclusory assessments from the treating physician); *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (when there is an inadequate medical record, an administrative law judge must *sua sponte* seek additional information); *Devora v. Barnhart*, 205 F. Supp.2d 164, 172–73 (S.D.N.Y. 2002) ("The duty of the ALJ to develop the record is particularly important when it comes to obtaining information from a claimant's treating physician.").

An administrative law judge's failure to develop the record adequately is an independent ground for vacating the administrative law judge's decision and

remanding the case. *See Moran v. Astrue*, 569 F.3d 108, 114-15 (2d Cir. 2009) ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision."); *see also Daviau v. Astrue*, No. 09–CV–0870 (MAD), 2012 WL 13543, at *6 (N.D.N.Y. Jan.4, 2012) (citing *Yankus v. Astrue*, No. 07–CV–0316 (JFB), 2008 WL 4190870, at *6 (E.D.N.Y. Sept.10, 2008) (where the administrative law judge fails to fully develop the record in accordance with the Second Circuit's mandate for *pro se* claimants, the Court cannot determine, as a matter of law, whether substantial evidence supports the administrative law judge's findings)).

Further development of a record is unnecessary, however, when existing evidence is consistent and sufficient to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520b(a). Reviewing courts hold that administrative law judges are not required to seek additional information absent "obvious gaps" that preclude an informed decision. *Rosa*, 168 F.3d at 79 n. 5; *see also Hart v. Commissioner of Soc. Sec.*, No. 5:07–CV–1270 (DNH), 2010 WL 2817479, at *5 (N.D.N.Y. July 10, 2012).

   *b.    Medical Disability Opinions in Workers' Compensation Cases*

Determining whether a person is disabled for workers' compensation purposes involves answering different questions than those involved in social security disability cases. *Roller v. Colvin*, No. 5:12–cv–01680 (TJM), 2014 WL 1280849, at *17 (N.D.N.Y. Mar. 27, 2014) (citing New York Workers' Compensation Law § 10, *et seq.*, and 20 C.F.R. § 404.1504).[6] Thus, evidence of a claimant's disability for workers' compensation purposes is not directly

---

[6]     "Workers' compensation determinations are directed to the workers' prior employment and measure the ability to perform that employment rather than using the definition of disability in the Social Security Act." *Lefever v. Astrue*, No. 07-CV-622, 2010 WL 3909487, at *13 (N.D.N.Y. Sept. 30, 2010) (emphasis added), *aff'd*, 443 Fed. App'x 608 (2d Cir. 2011).

relevant to the standard of disability set forth by the Social Security Act. *Flanigan v. Colvin*, No. 13 Civ. 4179 (AJP), 2014 WL 1979927, at \*17 n. 27 (S.D.N.Y. May 15, 2014); *see also Acevedo v. Colvin*, No. 12–cv–6536 EAW, 2014 WL 2069481, at \*9 n.7 (W.D.N.Y. May 19, 2014) (collecting cases). It follows that a determination made by another agency that a claimant is "disabled" is not binding on the Commissioner. 20 C.F.R. § 404.1504.

Even so, disability determinations made by other government agencies (*e.g.*, Veterans Administration, state workers' compensation boards) are "entitled to some weight and should be considered." *See Lohnas v. Astrue*, 510 Fed. App'x 13, 14–15 (2d Cir. 2013) (summary order) (quoting *Cutler v. Weinberger*, 516 F.2d 1282, 1286 (2d Cir.1975)). Such decisions and evidence used to make them may provide insight into an individual's mental and physical impairment(s), and will show the degree of disability determined by other agencies based on their rules. SSR 06-03p, Titles II and XVI: Considering Opinions And Other Evidence From Sources Who Are Not "Acceptable Medical Sources" In Disability Claims; Considering Decisions On Disability By Other Governmental And Nongovernmental Agencies, 2006 WL 2329939, at \*7 (SSA Aug. 9, 2006). Indeed, evidence from *all* sources can and should be considered to the extent it is relevant to determining *severity of impairments and how they affect individuals' ability to function.*

3.    Application

ALJ Ramos prudently might have submitted to Dr. Silverstein a request for clarification, or, even better, an official social security form used to assess residual functional capacity. He did not commit reversible error, however, when electing not to. Instead, he received and considered medical opinion evidence

from three other competent medical sources.[7] Wilbur does not identify, nor does the court's independent examination disclose an "obvious gap" rendering the existing medical record from those sources inadequate to determine whether Wilbur was disabled during the discrete period at issue. Nor does Wilbur point to any clinical and diagnostic finding or any opinion of specific functional limitations from Dr. Silverstein that ALJ Ramos disregarded.

---

[7]    These additional sources were as follows:

Dr. W. Jay Levy, M.D.

Dr. Levy, a neurosurgeon, performed an independent medical examination ("IME") on July 12, 2010, for the Workers' Compensation Board. (T. 810-21). Dr. Levy found that Wilbur's subjective complaints correlated with the objective findings of lumbar muscle spasm and imaging studies showing disc protrusion at L4-5 and a retrolisthesis on L5-S1 with root impingement. (T. 820). Dr. Levy opined that Wilbur had a marked, partial temporary disability. (Id.). He further opined that Wilbur's ongoing symptoms, supported by his imaging studies, prevent him from returning to full duty work. (Id.). According to Dr. Levy, Wilbur should be able to do light duty work with a 15 lb. lifting limit, avoiding frequent turning, bending, and lifting , and avoiding lifting above shoulder level. (T. 821).

Dr. Richard Weiskopf, M.D.

Wilbur underwent a consultative orthopedic examination with Dr. Weiskopf on March 12, 2010. (T. 792-95). Dr. Weiskopf observed upon examination that Wilbur had tenderness over the central lumbar area and over both sacroiliac joints and also tenderness in the sciatic notch area bilaterally. (T. 794). Flexion of the lumbar spine could only be done to 30 degrees; lateral flexion of the lumbar spine was limited to only 15 degrees. He diagnosed chronic low back pain, status post surgery and hypertension. Dr. Weiskopf opined that Wilbur has no limitations on sitting. He has mild to moderate limitation on standing and walking. He has severe limitation on bending, lifting, climbing, and carrying. He has good use of his hands regarding strength and fine motor activities. (Id.).

Susan Giegold, PT

Wilbur's physical therapist, Susan Giegold, completed a functional capacity evaluation on September 12, 2008. (T. 582-83). She opined that Wilbur could perform light work, lifting 20 pounds on an occasional basis and 10 pounds on a frequent basis; carrying approximately 20 pounds on an occasional basis and 10 pound on a frequent basis; squat, kneel, climb stairs, stand, and walk on an occasional basis; bend and crawl on an infrequent basis; never climb ladders, sit, reach, forward, and reach overhead on a frequent basis; perform critical balancing and fine hand manipulations; and operate light arm and leg controls. (T. 582-83).

By considering clinical and diagnostic findings and functional limitations in medical reports made in Wilbur's workers' compensation claim,[8] and in affording some weight to testimony given by treating physicians in connection with that claim, ALJ Ramos acted within the bounds of governing law. There is no reason, therefore, to reverse the Commissioner's decision based on an incomplete record or failure to consider treating physician opinion.

## B.  *Subjective Testimony*

Wilbur testified twice, *i.e.,* at an initial evidentiary hearing before ALJ Tielens in 2009, and at a second hearing before ALJ Ramos in 2011. At the first, he testified that lack of mobility prevented him from working, and that he could lift no amount of weight. (T. 65). He could not sit down for "too long" and could not stand up "for hardly any length of time." (*Id.*). He estimated that he could walk only a quarter of a mile, or drive for only fifteen minutes before it resulted in painful conditions. (*Id.*). Sometimes he would go shopping with his wife. (T. 67). He took care of his own personal hygiene (*Id.*), attended church on Sundays (T. 68), and watched quite a bit of television (T. 69). He had trouble sleeping because he could not get comfortable due to pain. (T. 69-70). His pain medications made him drowsy during the day. (T. 70). His pain level was about a "6" out of 10. (T. 70-71).

In 2011, Wilbur testified that he had gradually gotten worse. His wife did all the cleaning, cooking, and washing. (T. 82). His wife helped him put on socks; he wore slip-on shoes. (T. 81). He occupied himself during the day by watching television, reading, and getting on the laptop computer. (T. 83). He

---

[8]     There is reason to question whether ALJ Ramos did, in fact, consider treating source opinion for these purposes. *See* discussion of nonexertional limitations in Section V., *infra*. For purposes of this section, however, the court takes ALJ Ramos at his word, as it is a correct statement of governing legal principles.

used a five-point cane to steady himself. (T. 84). He laid down for 8 to 10 hours a day. (T. 83, 86). He could not drive. (T. 87).

During a pre-hearing, 2010 consultative orthopedic examination, Wilbur reported to the doctor that his wife did the cooking, cleaning and laundry. He helped with shopping once a week. He also helped with childcare with his three children. He dressed himself. He watched television, listened to the radio, read, went to church, wrote poetry and painted. (T. 793).

In a post-hearing 2011 consultative orthopedic examination, Wilbur reported to the doctor that his spouse now takes care of cooking, cleaning, laundry, shopping, shoveling snow, and other major chores around the house. He can shower daily but needs assistance doing so and in dressing. (T. 1012).

ALJ Ramos found that Wilbur's medically determinable impairments could reasonably be expected to cause the symptoms alleged; however, ALJ Ramos found that Wilbur's statements concerning intensity, persistence, and limiting effects of his symptoms prior to November 16, 2010 were not credible "to the extent they were inconsistent with the above residual functional capacity." (T. 28). Wilbur's subjective complaints of disability before November 16, 2010 were not fully credible because his daily activities reflected that he was actually doing more than what his allegations claimed he was capable of performing. (T. 29). ALJ Ramos amplified that "claimant was clearly able to engage in a wide range of independent daily activities prior to November 16, 2010." (*Id.*).

1.    Wilbur's Challenge

Wilbur argues that ALJ Ramos's finding that he engaged in a "wide range" of independent daily activities fails to consider Wilbur's testimony from his first hearing that provides more details regarding his activities of daily living.

Primarily, Wilbur contends that ALJ Ramos failed to apply proper legal standards because Wilbur's performance of basic daily activities does not contradict allegations of disability. Wilbur's brief cites a growing body of decisions within and outside this circuit to the effect that minimal and basic activities of daily living necessary to care for oneself and subsist are not a valid basis for discrediting subjective testimony regarding intensity, persistence and limiting effects of symptoms for workplace purposes. Wilbur's counsel then, quoting from an 8th Circuit case,[9] poses this rhetorical question:[10]

> "*How many times must we give instructions that watching television, visiting friends and going to church do not indicate that a claimant is able to work full time in our competitive economy?*"

2.    Governing Legal Principles

Testimony from claimants regarding persistence, intensity and limiting effects of symptoms not only is relevant, but desirable. On the other hand, it is subjective and can be colored by interest in obtaining a favorable outcome. An administrative law judge, therefore, engages in a difficult task of deciding how much weight to give claimants' subjective self-evaluations.

The Commissioner provides explicit guidance. A formally promulgated regulation requires consideration of seven objective factors that naturally

---

[9]        *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005).

[10]        As used above, "rhetorical question" means a question asked solely to produce an effect (especially to make an assertion) rather than to elicit a reply.

support or impugn subjective testimony of disabling pain and other symptoms.[11] The first factor, directly relevant here, is consideration of a claimant's daily activities.

When an ALJ rejects a claimant's testimony of pain and limitations, he or she must provide explicit reasons for rejecting the testimony. *See Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988); *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983). When an administrative law judge neglects to do so, a court cannot subject his credibility determination to meaningful review. *See Meadors v. Astrue*, 370 Fed. App'x 179, 184–85 (2d Cir. 2010) (summary order).

3.  <u>Application</u>

Wilbur advances appealing and forceful arguments that ALJ Ramos's assessment of Wilbur's subjective credibility may have been infirm. A fair reading of ALJ Ramos's decision suggests that his primary basis for finding Wilbur not fully credible regarding intensity, persistence and limiting effects of his symptoms during the period at issue was a "wide range of independent daily

---

[11]    An administrative law judge must evaluate a claimant's symptoms, including pain, based on medical and other evidence, including the following factors:

(i)     claimant's daily activities;
(ii)    location, duration frequency, and intensity of claimant's pain or other symptoms;
(iii)   precipitating and aggravating factors;
(iv)    type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate her pain or other symptoms;
(v)     treatment, other than medication, claimant receives or has received for relief of her pain or other symptoms;
(vi)    measures claimant uses or has used to relieve pain or other symptoms; and
(vii)   other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.

*See* 20 C.F.R. § 404.1529(c).

activities" that demonstrated Wilbur "was actually doing more than what his allegations claimed he was capable of performing." (T. 29). The examples cited by ALJ Ramos, however, hardly support that finding, much less suggest ability to engage in even sedentary work on a sustained basis (8 hours a day, 40 days a week).

Some of the "wide range" examples are nonsensical ("listen to the radio," "read for pleasure"). Others, at most, demonstrate nothing more than engaging in bare basic activities necessary for subsistence and survival. *See, e.g.*, *Stoesser v. Commissioner of Soc. Sec.*, No. 08-CV-643 (GLS/VEB), 2011 WL 381949, at *7 (N.D.N.Y. Jan. 19, 2011) (performance of basic daily activities does not necessarily contradict allegations of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves); *see also Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989).

Even so, there is no reversible error despite ALJ Ramos's dicey reasoning. Nothing in social security jurisprudence is more firmly established than that it is the prerogative of the Commissioner, not reviewing courts, to resolve evidentiary conflicts and to appraise credibility of witnesses, including the claimant. *Aponte v. Secretary, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). Consequently, reviewing courts are loathe to second-guess and overturn credibility choices made by administrative adjudicators. *See Pietrunti v. Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.' "); *see also Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) ("Normally, [the court] give[s] an ALJ's credibility determinations special deference because the ALJ is in the best position to see and hear the witness.").

Here, there was other evidence (albeit thin) that enables ALJ Ramos's questionable credibility choice to survive judicial review. First, Wilbur's self-evaluation of the disabling effects of his symptoms was inconsistent in some important respects with objective medical evidence.[12] And, as ALJ Ramos correctly noted, most of Wilbur's treating medical sources, as well as the consultative examiners, indicated at different times that Wilbur was capable of returning to light or sedentary work with retraining.

Second, Wilbur's testimony regarding his limitations was contradictory in some respects. Wilbur testified that he could not "lift any amount of weight" (T. 65), but subsequently acknowledged that he could lift a gallon of milk at least five times. (T. 67-68). He testified that he could not "sit down for too long a period" (T. 65), but later acknowledged that he watched television "quite a bit," and could sit and watch a 30-minute episode of the television show "Seinfeld" from start to finish without moving. (T. 69).

Given special deference due to the Commissioner's credibility choices, there is no compelling reason to reverse based on ALJ Ramos's assessment of Wilbur's subjective credibility.

## V. Ability to Perform Alternative, Available Work

When, at Step 4 of sequential evaluation, there is a finding that a claimant can no longer perform past relevant work, that claimant carries his burden to

---

[12]     In his orthopedic examination in March 2010, he could fully squat; his straight leg test was negative bilaterally; and he had no spasms or trigger points. (T. 793-94). In June 2010, during an examination by a neurosurgeon, Wilbur did not need assistance standing from sitting; his gait showed a normal pace and form; his toe and heel walking were grossly intact; and his tandem walking was well coordinated. (T. 818).

prove a *prima facie* case of disability.  *See Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984).  The burden then shifts to the Commissioner to show at Step 5 that such claimant can still perform alternative and available work.  *See* 20 C.F.R. § 404.1566; *see also DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998) (quoting *Berry*, 675 F.2d at 467).

Generally, the Commissioner elicits or consults two principal sources of extrinsic evidence.  First, witnesses qualified as "Vocational Experts" may testify as to whether jobs exist for a person with the claimant's precise abilities.[13] Second, a United States Department of Labor publication titled Dictionary of Occupational Titles ("DOT") can assist in determining when a claimant's residual work skills can be used in other work and the specific occupations in which they can be used.[14]

In limited circumstances, the Commissioner also may take administrative notice of disability *vel non* by applying findings published in Medical–Vocational Guidelines, commonly called "the grids."[15]  The grids are a matrix of general findings established by rule as to whether work exists in the national economy that a person can perform. They "take into account a claimant's [residual functional capacity], as well as [his] age, education, and work experience." *Calabrese v. Astrue*, 358 Fed. App'x 274, 276 & n. 1 (2d Cir. 2009) (summary order) (citing *Rosa*, 168 F.3d at 78).  When properly applied, they support a finding of ability to perform alternative, available work, and

---

[13]     *See* 20 C.F.R. § 404.1566(e); *see also* SSR 00-4p, TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS, 2000 WL 1898704, at *1-2 (SSA Dec. 4, 2000).

[14]     See 20 C.F.R. § 404. 1560(d)(1); *see also* SSR 00-4p, 2000 WL 1898704, at *1-2.

[15]     *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

ultimately yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F. Supp. 662, 667 & n. 2 (S.D.N.Y. 1996).

## A.  *Wilbur's Challenge*

Wilbur contends that ALJ Ramos's Step 5 determination is unsupported by substantial evidence because he failed to obtain vocational expert testimony on the issue of whether he can perform alternative and available work. Wilbur alleges that his significant nonexertional limitations, including inability to stoop, precluded ALJ Ramos from applying the grids directly to make such determination.

## B.  *Governing Legal Principles*

When only exertional limitations exist,[16] and findings of residual functional capacity, age, education, and previous work experience coincide with grids parameters, administrative law judges may directly apply the grids to determine whether work exists in the national economy which claimants can perform.[17] But, when residual functional capacity findings do not coincide with all grid criteria, grid rules cannot be applied directly. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00. Similarly , direct application of the grids to determine

---

[16]     An "exertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (*i.e.*, sitting, standing, walking, lifting, carrying, pushing, and pulling).  20 C.F.R. § 404.1569a(b).

[17]     *See Martin v. Astrue*, 337 Fed. App'x 87, 91 (2d Cir. 2009) (summary order); *Thompson v. Barnhart*, 75 Fed. App'x 842, 844 (2d Cir. 2003) (summary order) (Commissioner can meet Step 5 burden "by resorting to the applicable medical-vocational guidelines (the grids)"); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

disability is inappropriate when claimants' nonexertional impairments[18] have more than a negligible impact on their ability to perform a full range of work. *See Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013) (quoting *Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2010)).  This is because the grids do not take into account limiting or disabling effects of nonexertional impairments.  (*Id.*)

Although the grids cannot be applied directly in such instances, they are not a bursting bubble. The Commissioner's regulation permits administrative law judges to consult them as a "framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by . . . nonexertional limitations." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2).  Two Social Security rulings address this "framework" analysis.[19]  They direct that when a claimant has both exertional and nonexertional impairments, an administrative law judge should first consult the grids, along with consideration of the claimant's residual functional capacity and vocational factors, to determine the extent of impairment caused by exertional limitations.  When the degree of limitation caused by an exertional impairment, alone, is such that a claimant is deemed disabled under a grid rule, the inquiry ceases, and benefits are awarded.  But, when *exertional* limitations alone are not that debilitating, an administrative judge should next determine how much a claimant's "occupational base" is further reduced by effects of

---

[18]    A nonexertional limitation is an impairment caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling.   Environmental restrictions are also considered to be nonexertional.    SSR 96-9p, Determining Capability To Do Other Work, Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work, 61 Fed. Reg. 34478, 34481 (July 2, 1996).

[19]    *See* SSR 85-15, Titles II and XVI: Capability to do other work The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments, 1985 WL 56857, at *3 (SSA 1985); *see also* SSR 83-14, Titles II and XVI: Capability to do other work the medical-vocational rules as a framework for evaluating a combination of exertional and nonexertional impairments, 1983 WL 31254, at *2, 4 (SSA 1983).

*nonexertional* limitations.[20] When claimants can be expected to make vocational adjustments, and, despite all limitations, still have a large potential occupational base, they ordinarily will not be found disabled under a "framework" analysis. *Id*.

This erosion analysis generally contemplates at least some evidence in addition to the grids.[21] In certain instances, however, the Commissioner has taken administrative notice that nonexertional limitations do not significantly erode a sedentary occupational base, and in those instances, extrinsic evidence is unnecessary.[22]

To summarize, when both exertional and nonexertional impairments are present, an administrative law judge theoretically can find a claimant *disabled*

---

[20]     "Occupational base" is defined as:

The number of occupations, as represented by RFC, that an individual is capable of performing. These "base" occupations are unskilled in terms of complexity. The regulations take notice of approximately 2,500 medium, light, and sedentary occupations; 1,600 light and sedentary occupations; and 200 sedentary occupations. Each occupation represents numerous jobs in the national economy. (In individual situations, specific skilled or semiskilled occupations may be added to the base.).

SSR 83-10, TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK—THE MEDICAL-VOCATIONAL RULES OF APPENDIX 2, 1983 WL 31251, at *7 (SSA 1983).

[21]     *See Bapp*, 802 F.2d at 606 (when nonexertional limitations significantly diminish a claimant's ability to perform the full range of work, testimony of either a vocational expert or other similar evidence regarding the existence of jobs in the national economy for an individual with claimant's limitations is required); *Rosa*, 168 F.3d at 78; *see also Heckler*, 461 U.S. at 462 n. 5 ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered."); *Butts v. Barnhart*, 388 F.3d 377, 383-84 (2d Cir. 2004) (if the grid fails "to describe the full extent of [the] claimant's physical limitations," the Commissioner must introduce testimony to prove "that jobs exist in the economy which the claimant can obtain and perform"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e).

[22]     *See* SSR 96-9p, 61 Fed. Reg. at 34482 ("Postural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work.").

when a grid directs such a finding solely on the basis of severity of exertional impairments. But, when exertional impairments alone direct a grid finding of not disabled, an administrative judge next must determine (usually from other evidence) how much nonexertional impairments further diminish that claimant's occupational base. Only when a large occupational base remains can an administrative judge find a claimant not disabled.

## C.    *Application*

ALJ Ramos assessed Wilbur's residual functional capacity as being for a full range of sedentary work with no "nonexertional limitations before November 16, 2010." (T. 32).  Unfortunately, this factual finding was patently incorrect. Every medical source – treating and consultative – opined that Wilbur has a nonexertional postural limitation inhibiting his ability to bend or stoop.[23]

---

[23]    These medical sources all indicated significant nonexertional postural limitations:

- Dr. Silverstein (treating source):  found that Wilbur had zero degrees flexion and extension of the lumbar spine.  (T. 932, 935).

- Dr. Elaina A. Pirro-Lombardi, D.C. (treating source): limited Wilbur to "no bending" after reviewing results of nerve conduction studies.  (T. 963).

- Dr. Hoplyn Beaton, M.D. (treating source): observed that Wilbur experienced pain upon flexion of lumbar spine and "excruciating" pain upon straight leg raising bilaterally. (T. 807).

- PT Giegold (treating source): completed a functional capacity evaluation and opined that Wilbur is limited to infrequent bending.  (T. 582).

- Dr. Weiskopf (consultative orthopedic examiner):  opined Wilbur has a severe limitation on bending.  (T. 794).

- Dr. Levy (consultative neurosurgeon examiner):  opined that Wilbur should avoid frequent bending.  (T. 821).

ALJ Ramos was not free, therefore, to substitute his opinion to the contrary based on his own lay interpretation of raw medical data.[24] Given undisputed medical evidence establishing existence of this significant nonexertional limitation, ALJ Ramos was obliged, instead, to conduct a "framework" analysis to determine the extent that Wilbur's sedentary occupational base was eroded by his nonexertional limitation. No such "framework" analysis appears in ALJ Ramos's decision, and a reviewing court must, therefore, conclude that he erred by applying grid Rule 201.21 directly to satisfy the Commissioner's Step 5 burden. (T. 32).

### D.    Harmless Error Analysis

Congressional mandates requiring courts to review administrative decrees in light of "the rule of prejudicial error" and to disregard all administrative errors and defects not affecting "substantial rights" refer to what modern jurisprudence calls "harmless error doctrine." *See Shinseki v. Sanders*, 556 U.S. 396, 406-08 (2009). Under this doctrine, a reviewing court must reverse and remand when an administrative law judge errs unless, as a matter of law, the result was not affected by the error. *See NLRB v. Enterprise Assoc.*, 429 U.S. 507, 522 n. 9 (1977). In other words, administrative legal error is harmless when the same result would have been reached had the error not occurred. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration.").

---

[24]    *See Burgess v. Astrue*, 537 F.3d 117, 131 (2d Cir. 2008) ("Neither a reviewing judge nor the Commissioner is permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion, or indeed for any competent medical opinion.") (internal quotation marks and citations omitted).

Here, the record contains no testimony from a vocational expert or similar source quantifying the extent of Wilbur's remaining sedentary occupational base given his nonexertional postural limitation. Consequently, ALJ Ramos's Step 5 finding is not supported by substantial evidence. Broadly viewed, adverse administrative decisions unsupported by substantial evidence always affect substantial rights, and, therefore, are not harmless.[25]

*If* ALJ Ramos had acknowledged Wilbur's nonexertional postural limitation, and *if* he had factored it into a residual functional capacity assessment, and *if* he had found that Wilbur can bend and stoop occasionally, and *if* such finding were permissible under the Commissioner's prescribed rules for weighing medical opinion evidence,[26] a reviewing court might find his Step 5 error harmless. The Commissioner has taken administrative notice that a restriction to *occasional* stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work.[27] Thus an error in directly applying grid Rule 201.21 to determine whether Wilbur could perform alternative, available work might be viewed as harmless under those circumstances because the court could conclude that the same result would have been reached under either a direct application or framework application of the rule.

---

[25] Both the Administrative Procedure Act and the Social Security Act give proponents of administrative actions statutory rights to orders supported by substantial evidence. *See* 5 U.S.C. § 706(d); 42 U.S.C. § 405(g). The Constitution condemns arbitrary and capricious exercise of government power, and, for over a century, American jurisprudence has recognized that administrative fiats not fairly supported by evidence are arbitrary and baseless. *Interstate Commerce Comm'n v. Louisville & Nashville R.R. Co.*, 227 U.S. 88, 91 (1913); *see also Rice v. Shalala*, No. 93-1305, 1 F.3d 1234 (Table), 1993 WL 309631, at *5 n. 6 (4th Cir. Aug. 16, 1993) (acknowledging that substantive due process rights are implicated when Commissioner's decision not supported by substantial evidence).

[26] ALJ Ramos would need to have and articulate a valid reason for weighing opinion evidence from one-time consultative examiners more heavily than opinions of treating sources.

[27] *See* SSR 96-9p, 61 Fed. Reg. at 34482.

Unfortunately, none of these "ifs" occurred. And, given the array of medical opinions on the extent of Wilbur's nonexertional postural limitation, a reviewing court cannot precisely predict what findings would have been made, nor can the court itself make such findings *de novo*. Consequently, the court cannot confidently conclude that ALJ Ramos would have come to the same result absent his Step 5 error. This, in turn, precludes a harmless error determination.

## VI.   Conclusion

For reasons stated herein, the Commissioner's decision will be reversed and remanded, pursuant to 42 U.S.C. § 405(g), sentence four, for further proceedings.

Signed on the ___30___ day of _____May_____ 2014.

_Earl S. Hines_
Earl S. Hines
United States Magistrate Judge